## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Rosemary Marsh, and on behalf of herself and all others similarly situated,<br><br>                              Plaintiff,<br><br>     v.<br><br>PNC Bank, National Association,<br><br>                              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Rosemary Marsh, on behalf of herself and all others similarly situated, files this Class Action Complaint ("Complaint") against Defendant PNC Bank, National Association ("PNC"), and alleges the following:

### NATURE OF THE ACTION

1.      This action seeks to redress the unfair and deceptive practices committed by PNC Bank, National Association ("PNC") in connection with its home mortgage loan servicing business.  Taking advantage of the economic downturn and the increasing number of loans in default, PNC services home loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments.  Consistent with these practices, PNC uses automated mortgage loan management systems to engage in a deceptive and unfair scheme to collect fees for unnecessary property inspections, a default-related service, cheating borrowers who can least afford them.

2.      Using an automated system, PNC orders drive-by property inspections whenever a borrower falls sufficiently behind on their payments.  Until the borrower becomes current, PNC continues to order these inspections at regular intervals, and it charges borrowers a fee for each inspection.

3.      The only reasonable or necessary purpose of drive-by inspections is to determine whether a home is occupied.  However, even when PNC knows that homeowners still occupy their homes and do not intend to abandon it, just because they are behind in payments, PNC continues to order and charge for property inspections.

4.      This practice is directly contrary to standard form security agreements for the mortgages PNC services, which only allow for default related services like property inspections when they are necessary or reasonable.  A drive-by property inspection is neither reasonable nor necessary, especially when it is automatically ordered without regard to whether PNC has information indicating that a property is not actually abandoned or vacant.

5.      Such information might include, but is not necessarily limited to, knowledge on the part of PNC that: the borrower is making partial payments; the borrower is in contact with PNC; the borrower has made known to PNC that he or she does not intend to abandon or vacate the property; or that the borrower and PNC are working out a loan modification or other settlement of the outstanding amount due.

6.      No reasonable consumer would ever enter into the mortgages serviced by PNC if they knew that it would order such unnecessary and unreasonable property inspections in the event that they had difficulty making their payments.

7.      Nor would any reasonable consumer, when presented with a uniform and non-negotiable mortgage security agreement serviced by PNC, understand or expect that PNC would order such unnecessary and unreasonable property inspections given the limitations contained in those agreements that such inspections would only be performed when necessary or reasonable.

8.      When borrowers go into default and PNC unilaterally decides to instruct third parties to perform unreasonable and inappropriate property inspections, borrowers have no ability

to prevent such inspections, and they must pay the fees or face further consequences of being in default, such as eviction and foreclosure and escalating principle and interests costs.

9.      Plaintiff brings this action seeking injunctive relief and damages on behalf of herself and the hundreds of thousands or millions of borrowers who have been victimized by PNC's uniform practice of charging for unreasonable and inappropriate property inspection fees.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) (CAFA) because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from PNC's citizenship, and (c) the matter in controversy exceeds $5 million, exclusive of interest and costs.

11.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because this is a judicial district in which PNC resides and because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## PARTIES

12.      Plaintiff Rosemary Marsh is a resident of Bremerton, Washington.

13.      Defendant PNC is a national banking association, with a main office and principal place of business in Pittsburgh, Pennsylvania.

## FACTS

14.      The servicing of mortgage loans, including loans serviced by PNC, has become largely automated in the United States.   Accordingly, PNC automatically orders property inspections using a computer system if an account has been in default for a specified period of time, and it continues to order inspections so long as the borrower remains in default.

15.     Other factors are not considered, including whether there is any need for a property inspection or whether a property inspection is needed or reasonable under the circumstances.

16.     Nor does the automated system consider whether a property inspection is permitted under the terms of mortgage documents.  Instead, the process is conducted in a uniform and indiscriminate manner that captures all delinquent accounts.

17.     Property inspections are even performed when PNC is aware that a property is not vacant, or where the property owner is in contact with PNC regarding efforts to resolve a delinquency.

18.     Every month, borrowers are assessed fees for these unneeded and unreasonable inspections.

19.     At the time the fees are assessed, PNC knows that the property inspections were conducted, and that the fees were assessed without regard to whether an inspection is needed or reasonable.

20.     Those fees are listed in borrowers' monthly statements.  When borrowers receive those statements, they have no reason to believe that they had been charged for services that were not needed or reasonable and a reasonable borrower would not believe otherwise.   Nothing in the statements indicates that borrowers had been charged for services that are not needed or reasonable.

21.     PNC's continuous assessment of fees for these inspections on borrowers' accounts is also improper because of the frequency with which they are performed.  Even if a first inspection is reasonable or necessary, if the first inspection report does not indicate that a property is vacant or in substantial disrepair, it is unnecessary and unreasonable for PNC to automatically continue to order monthly inspections.

22.     For example, if a borrower misses one month's periodic payment, but continues to consistently make monthly periodic payments thereafter, he or she is considered by Defendant to be in default on the loan until the initial default is cured.  Therefore, although a borrower continues to make regular periodic payments after having only missed one month's payment, PNC's system will continue to generate work orders for property inspections until the initial default is cured.

23.     As the United States Bankruptcy Court for the Eastern District of Louisiana held *In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008), a bank's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default -- and to continuously order those inspections thereafter until the default is cured -- is neither necessary nor reasonable as this practice is not designed to protect the lender's interest in the property.  Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting the bank's bottom line.

24.     That these computer-generated inspections are unnecessary and unreasonable, confer no benefit on the lender, and serve no discernible purpose other than to generate revenue for PNC is further evidenced by the limited nature of the inspections themselves.  The property inspections ordered by Defendant's computer system are mere "drive-by" inspections, *i.e.*, the inspector "drives by" the property ostensibly to assess whether the property is occupied, being maintained, and has not been damaged -- a practice that provides little, if any, real opportunity to determine whether the lender's interest in the property is at risk.

25.     Such a consumer-oriented business practice is inherently deceptive and unfair because borrowers are routinely and automatically assessed fees for services that are ordered without regard to whether there was any need or reason to perform such services in the first place.

Regardless of whether they are needed or reasonable, property inspections are automatically ordered and associated fees are automatically assessed to borrowers.

26. PNC profits off of these fees. To the extent the fees are the amounts charged to PNC by vendors that perform property inspections and BPOs, PNC may not immediately pay vendor charges, but it does immediately assess fees against borrowers for the inspections. As a result, PNC profits from the "float" by collecting fees before paying vendors.

27. Also, when borrowers pay assessed fees, they are paying money that otherwise would be applied to the loan principal and accruing interest. As a result, interest continues to accrue and compound with respect to that principal and interest that otherwise would have been paid down. This is yet another way PNC profits through this deceptive and unfair business practice because it results in the increase of borrowers' debts.

28. Reasonable consumers would not know at the time they sign such a mortgage agreement that they could be charged for such fees despite the fact the services may not be necessary or reasonable.

29. Before any borrower enters into a mortgage with PNC, they are presented, before they are asked to consummate the transaction, with uniform non-negotiable mortgage agreements that provide that default relates services will only be charged to the borrower when they are needed or reasonable. Reasonable borrowers subject to a mortgage agreement that allow default related services like property inspections only when they are needed or reasonable would believe that they would not be charged for such unneeded or unreasonable services. No reasonable borrower would understand that PNC would use an automated system to charge for inspections fees irrespective of whether the property is vacant, regardless of whether borrowers are making at least partial payments, whether PNC is in contact with borrowers who indicates that they intend on keeping

the home and remedying the default, or whether PNC and the borrower are negotiating a loan modification or other resolution of the default.

30.    Borrowers suffer monetary damages in the form of additional, unlawful debts assessed on borrowers' accounts and subsequently paid by borrowers.  Borrowers have no choice but to pay these improper fees -- if they do not they risk losing their homes.

31.    Moreover, the assessment of these fees can make it difficult if not impossible for borrowers to become current on their loans.  Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

32.    When borrowers get behind on their loan payments, and fees for these default-related services are stacked on to the past-due principal and interest payments, PNC's practices make it increasingly difficult for borrowers to ever bring their loans current.

**PNC Charged Plaintiff Unnecessary And Unreasonable Property Inspection Fees**

33.    In 2013, Plaintiff and her husband obtained a mortgage from PNC on their home in Bremerton.  That mortgage agreement provided that if Plaintiff failed to make her mortgage payments, PNC could do whatever was necessary to protect the value of the home, and that the costs for doing so would be added to Plaintiff's debt and be due and immediately payable.

34.    Due to unforeseen and unfortunate circumstances, Plaintiff fell behind in her payments later that year.  Accordingly, PNC began charging Plaintiff for inspection fees.  But these inspections were neither needed nor reasonable because Plaintiff and PNC were in contact and PNC knew not only that Plaintiff intended on continuing to inhabit the home, but it knew she was making every effort to obtain a loan modification so that she could make affordable payments.

35.    For example, on January 1, 2014, Plaintiff submitted a Uniform Borrower Assistance Form to PNC, which is the first step a PNC borrow takes when seeking a loan

modification or other form of hardship relief, the express purpose of which is to allow the borrower to continue to reside in the home rather than vacate it.  PNC received this form along with other required materials, and yet on January 21, 2014, less than three weeks later, PNC charged Plaintiff $12.00 for a property inspection.

36.     On January 29, 2014, a PNC representative spoke with Ms. Marsh, confirmed and verified her identity, and noted in PNC's electronic servicing database that the property was occupied and that Plaintiff intended to keep it that way.  Indeed, On January 29, Ms. March called PNC seeking an update on her forbearance/modification request.  On January 30, 2014, PNC received a fax from Plaintiff providing further documentation in furtherance of that request. Plaintiff called again on February 13, 2014 in response to calls from PNC regarding that request. PNC denied the request allegedly because of incomplete paperwork.  Despite these repeated contacts, on February 18, 2014, PNC charged Plaintiff $12.00 for another property inspection.

37.     On May 16, 2014, Plaintiff submitted another Uniform Borrower Assistance Form to PNC, seeking to correct the supposed errors in her January 2014 request.  Between  May 23, 2014, and June 11, 2014, Plaintiff spoke with PNC on at least seven occasions in connection with her request for a modification or other forbearance option so that she could stay in her home, and PNC noted in its automated system that it had confirmed Plaintiff's identify and verified that she was occupying the home.  Despite these repeated contacts, on June 12, 2014, PNC charged Plaintiff $12.00 for another property inspection.

38.     Between June 16, 2014 and June 20, 2014, Plaintiff spoke with PNC on at least five occasions in connection with her request for a modification or other forbearance so that she could stay in her home, and PNC noted in its automated system that it had confirmed Plaintiff's identify

and verified that she was occupying the home.  Despite these repeated contacts, on July 15, 2014,

PNC charged Plaintiff $12.00 for another property inspection.

      39.     On February 23, 2015, Plaintiff made a payment on her mortgage following

repeated contacts with PNC in which that it had confirmed Plaintiff's identify and verified that she

was occupying the home.  Nonetheless, on March 5, 2015, PNC charged Plaintiff for yet another

property inspection.

      40.     On May 11, 2015, PNC spoke with Ms. Marsh and advised her that the loan

modification was approved, and to that end, Plaintiff made substantial payments to PNC on her

mortgage between May 11 and May 22, 2015.  Indeed, in April 2014, PNC informed Plaintiff that

these payments would make her account current through the end of June, 2015.  Nonetheless,

Plaintiff was charged a property inspection fee of $12.00 on May 22, 2015, even though Plaintiff

had been regularly making her monthly payments since January 2015.

      41.     These inspection fees, which were paid by Plaintiff, were unnecessary and

unreasonable because Plaintiff was in contact with PNC, indicated that she did not want to leave

her home, made payments, and spent considerable time and effort working with PNC on a loan

modification.  Thus, PNC knew that Plaintiff's home had not been abandoned, and therefore the

drive by inspections were not needed or reasonable.

## CLASS ACTION ALLEGATIONS

      42.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action against PNC as a class

action on behalf of herself and all members of the following nationwide class:  All mortgagors of

a mortgage serviced by PNC who were charged a fee for property inspections (the "National

Class").

43.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action against PNC as a class action on behalf of themselves and all members of the following subclass:  All Washington residents who are mortgagors of a mortgage serviced by PNC who were charged a fee for property inspections (the "Washington Class").

44.     All of the members of the classes and sub-classes are collectively referred to as the "Class" or "Class Members."

45.     Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether class certification is appropriate.

46.     Excluded from the Class are: (i) Defendant and any entities in which Defendant has a controlling interest; (ii) any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant; (iii) the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; and (iv) all governmental entities.

47.     The members of the Class are so numerous that their joinder is impracticable.

48.     All members of the Classes have been subject to and affected by the same practices and policies described herein.  There are questions of law and fact that are common to the Classes and which predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to, the following:

    a.   Whether Defendant engaged in a uniform practice of deceptively and unfairly assessing fees against borrowers for services that were unneeded and unreasonable;

    b.   Whether Defendant engaged in a uniform practice that violated that the terms of uniform mortgage agreements;

     c.   Whether Defendant's unlawful, deceptive, and unfair practices harmed Plaintiff and the Classes;

     d.   Whether the Court can enter declaratory and injunctive relief; and

     e.   The proper measure of damages.

49.    The claims of the named Plaintiff are typical of the claims of the Classes and do not conflict with the interests of any other members of the Classes in that the Plaintiff and the other members of the Classes were subject to the same wrongful policies and practices by Defendant.

50.    The individually named Plaintiff will fairly and adequately represent the interests of the proposed Classes.  She is committed to the vigorous prosecution of the Classes' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions.

51.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for the parties opposing the Classes.  Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Classes.

52.    The Defendant has acted or refused to act on grounds generally applicable to the Classes, making final declaratory or injunctive relief appropriate.

53.    The Classes are easily ascertainable as Defendant's computerized records can identify all mortgagors who paid property inspections.

54.    The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members.

55.     Notice to the proposed Classes can be achieved through the U.S. mail to the addresses of the Class members that are kept within Defendant's records.

56.     A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

      a.   Individual claims by the members of the Classes are impractical as the costs of litigation far exceed what any one individual plaintiff has at stake;

      b.   As a result, individual members of the Classes have no interest in prosecuting and controlling separate actions;

      c.   It is desirable to concentrate litigation of the claims herein in this forum;

      d.   The proposed Classes are manageable.

57.     Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
**On Behalf Of The National Class And The Washington Class**

58.     Plaintiff repeats and realleges all the foregoing allegations as if they were fully set forth herein.

59.     Plaintiff brings this claim for relief on behalf of herself and the members of the Nationwide Class.

60.     Plaintiff and members of the Nationwide Class entered into mortgage agreements with substantially similar language providing that PNC would only charge for default-related services like property inspections when they are needed or reasonable.

61.     PNC breached these mortgage agreements by assessing fees against Plaintiff and

the Nationwide Class members for property inspections that were not needed or reasonable.

62.     As a result of this breach of contract, Defendant has caused and continues to cause injury to Plaintiff and the Nationwide Class members, who paid or will pay fees for unreasonable and unnecessary property inspections.

63.     Defendant has also breached the duty of good faith and fair dealing.  Mortgagors like Plaintiff reasonably expected that Defendant would use any discretion it has with respect to ordering and charging for property inspections in good faith and that it would only order such inspections when they were reasonable or necessary.  But Defendant frustrated those expectations by not using its discretion at all, but instead ordering property inspections using an automated system, or by abusing that discretion to order inspections that were nether reasonable nor necessary.  Mortgagors like Plaintiff would not have entered into their mortgages with PNC if they knew their reasonable expectations with respect to default–related services (namely that they would only be ordered when reasonable or necessary) would be frustrated.

64.     As a result of the foregoing, Plaintiff and Nationwide Class members are entitled to their actual damages.

65.     Plaintiff and the Nationwide Class members are also entitled to injunctive, equitable, and declaratory relief, including an injunction barring Defendant from committing future breaches of its contractual obligations.

### SECOND CLAIM FOR RELIEF
**Violation Of The Washington Consumer Protection Act,**
**Wash. Rev. Code Ann. §§ 19.86.010, e*t seq.* On Behalf Of The Washington Class**

66.     Plaintiff repeats and realleges all the foregoing allegations as if they were fully set forth herein.

67.     Plaintiff brings this action on behalf of herself and the Washington Class against Defendant.

68.     The Washington Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.86.020.

69.     Plaintiff and Washington Class Members are "persons" within the meaning of Wash. Rev. Code Ann. § 19.86.010(1).  Plaintiff and Washington Class Members were charged for unnecessary and unreasonable property inspections.

70.     PNC is also a "person" within the meaning of Wash. Rev. Code Ann. § 19.86.010(1).

71.     Defendant has violated the Consumer Protection Act by knowingly and intentionally engaging in the deceptive, misleading, and unfair practices described herein, which are unconscionable and which offend public policy and which are immoral, unethical, unscrupulous and substantially injurious to consumers.

72.     Defendant knowingly misrepresented and intentionally omitted material information regarding the nature of the fees that would be assessed to borrowers' accounts for unnecessary and unreasonable services, including property inspections.

73.     Despite knowledge that the property inspections were unnecessary and unreasonable, Defendant concealed the fact that defaulting borrowers would automatically and repetitively be charged for such services.

74.     Defendant acted deceptively by presenting borrowers with mortgage agreements that misleadingly and deceptively indicate that borrowers will not be charged for unnecessary and unreasonable services.

75.     Defendant did so, despite knowledge that borrowers in default would be automatically and repeatedly charged for unnecessary and unreasonable services.

76.     Defendant's unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the Washington Class Members, into believing that they would only be charged for reasonable or necessary property inspections.

77.     Regardless of the terms of any applicable mortgage agreement, Defendant also engaged in deceptive conduct by engaging in a practice of automatically and repeatedly assessing fees for property inspections against borrowers in default without regard to, or consideration of, whether those services were necessary and reasonable.

78.     Defendant did so through an automated computer system that only looked to whether an account was in default, and did not consider whether a property inspection would otherwise be reasonable or necessary.

79.     Defendants knew or should have known that their conduct violated the Consumer Protection Act.

80.     Defendant's unfair or deceptive trade practices were fraudulently concealed and likely to, and did, deceive reasonable consumers, including the Plaintiff and Washington Class Members, into believing that they would only be charged for reasonable or necessary property inspections.  Defendant intentionally and knowingly misrepresented and/or omitted material facts regarding property inspections with the intent of deceiving Plaintiff and Washington Class Members.

81.     Defendant's violations present a continuing risk to Plaintiff and Washington Class Members, as well as to the general public who risk irreparable injury as a result of Defendant's

acts and omissions in violation of the Consumer Protection Act.  Defendant's unlawful acts and practices complained of herein affect the public interest.

82.     Plaintiff and Washington Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive acts and omissions. Plaintiff and Washington Class Members would not have entered into a mortgage with PNC if they knew they would be charged for unreasonable or unnecessary property inspections

83.     As a direct and proximate result of Defendant's violations of the Consumer Protection Act, Plaintiff and Washington Class Members have suffered injury-in-fact and/or actual damage.

84.     Plaintiff and Washington Class Members are entitled to recover three times actual damages, attorneys' fees, costs and other relief under Wash. Rev. Code Ann. § 19.86.090.

85.     Plaintiff and Washington Class Members also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the Consumer Protection Act.

<u>**THIRD CLAIM FOR RELIEF**</u>
**Unjust Enrichment**
**On Behalf Of The National Class And The Washington Class**

86.     Plaintiff repeats and realleges all the foregoing allegations as if they were fully set forth herein.

87.     Plaintiff and the members of the Classes conferred a benefit upon Defendant in the form of fees for unnecessary and unreasonable property inspections.

88.     Defendant received this benefit with an appreciation or knowledge of the benefit.

89.     Defendant accepted and retained the benefit under circumstances that make it inequitable for the receiving party to retain the benefit.

90.     Defendant was unjustly enriched.

91.     As a direct and proximate result of Defendant's unjust enrichment Plaintiff and Class Members have suffered injury-in-fact and/or actual damage.

92.     As a result, Plaintiff and the Class Members are entitled to a disgorgement of all amounts Defendant has been unjustly enriched, as well as their actual damages, punitive damages, reasonable attorney's fees and costs, and injunctive, declaratory, and equitable relief barring future unlawful conduct by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment against Defendant as follows:

A.     Certifying this action as a class action, with Classes and Subclasses as defined above;

B.     Requiring that Defendant pay for notifying the Class members of the pendency of this suit;

C.     Awarding Plaintiff and the Classes all injunctive, declaratory, and equitable relief to which they are entitled;

D.     Awarding Plaintiff and the Classes monetary damages in an amount to be determined at trial, together with pre and post-judgment interest;

E.     Awarding Plaintiff and the Classes statutory damages in the maximum amount provided by law;

F.     Awarding Plaintiff and the other Classes members the reasonable costs and expenses of suit, including their attorneys' fees; and

G.     For any further relief that the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all claims and causes of action in this lawsuit to which they is so entitled.

Dated:  October 31, 2017         Respectfully submitted,


By:   *s/ Edwin J. Kilpela*
Edwin J. Kilpela
Kevin Abramowicz
**CARLSON LYNCH SWEET KILPELA &
CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Fax: (412) 231-0246
ekilpela@carlsonlynch.com
kabramowicz@carlsonlynch.com


D. Greg Blankinship (*pro hac vice* forthcoming)
Bradley F. Silverman (*pro hac vice* forthcoming)
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP.**
445 Hamilton Ave, Suite 605
White Plains, New York 10601
Telephone:  (914) 298-3281
Fax:  (914) 908-6709
gblankinship@fbfglaw.com
bsilverman@fbfglaw.com


*Counsel for Plaintiff and the Classes*